independent distributors fail to adequately promote, market and sell our products, our sales could significantly decrease.

We face significant challenges and risks in managing our geographically dispersed distribution network and retaining the individuals who make up that network. If any of our direct sales representatives were to leave us, or if any of our independent distributors were to cease to do business with us, our sales could be adversely affected. Some of our independent distributors account for a significant portion of our sales volume, and if any such independent distributor were to cease to distribute our products, our sales could be adversely affected. In such a situation, we may need to seek alternative independent distributors or increase our reliance on our direct sales representatives, which may not prevent our sales from being adversely affected. If a direct sales representative or independent distributor were to depart and be retained by one of our competitors, we may be unable to prevent them from helping competitors solicit business from our existing customers, which could further adversely affect our sales. Because of the intense competition for their services, we may be unable to recruit or retain additional qualified independent distributors or to hire additional direct sales representatives to work with us. We may not be able to enter into agreements with them on favorable or commercially reasonable terms, if at all. Failure to hire or retain qualified direct sales representatives or independent distributors would prevent us from maintaining or expanding our business and generating sales.

As we launch new products and increase our marketing efforts with respect to existing products, we will need to expand the reach of our marketing and sales networks. Our future success will depend largely on our ability to continue to hire, train, retain and motivate skilled direct sales representatives and independent distributors with significant technical knowledge in various areas, such as spinal care practices, spine injuries and disease and spinal health. New hires require training and take time to achieve full productivity. If we fail to train new hires adequately, or if we experience high turnover in our sales force in the future, we cannot be certain that new hires will become as productive as may be necessary to maintain or increase our sales.

If we are unable to expand our sales and marketing capabilities domestically and internationally, we may not be able to effectively commercialize our products, which would adversely affect our business, results of operations and financial condition.

*Id.* at 28-29.

42. The foregoing disclosures concerning risks relating to the Company's business, results of operations, and financial condition were false and misleading at the time they were made because, as stated above, Defendants knew or recklessly disregarded that they had determined to terminate the Vortex distributorship and replace Vortex with a new, in-house sales representative to cover the territory. Further, Defendants knew or recklessly disregarded the risk that termination of a "significant" distributor such as Vortex would have a substantial, negative impact upon the Company's business, results of operations, and financial condition. The foregoing omissions render the risk disclosure meaningless. Since an independent distributor with a substantial customer base was about to cease distributing Globus products, the risk that the Company's sales will be adversely affected was no longer hypothetical. Such risk had materialized, and Defendants were duty bound, but failed, to disclose the specific risk to the Company's financial condition.

43. In addition, the foregoing statements violated SEC Regulation S-K, Item 303, 17 C.F.R. § 229.303(a), which required Globus, in its 2013 10-K, to "describe any unusual or infrequent events ... or any significant economic changes that materially affected the amount of reported income from continuing operations," and to "indicate the extent to which income was so affected." 17 C.F.R. § 229.303(a)(3)(i). The Company also was required to disclose "any known ... uncertainties that have had or that the registrant reasonably expects will have a materially favorable or unfavorable impact on net sales or revenues or income from continuing operations." *Id.* § 229.303(a)(3)(ii). By acknowledging that the Company's last instance of "distributor turnover" occurred in 2010, Defendants admitted that the Vortex termination was an "unusual" or "infrequent" event. Further, through their President and COO's acknowledgment that the Company "made the decision not to renew our existing contract with a significant U.S. distributor," and statements from the Chairman/CEO and CFO that it took the Company anywhere from one to

two years to recover from "distributor turnover" in 2010, Defendants admitted that the Company reasonably expected the Vortex termination to have a materially unfavorable impact on its net sales, revenues, and income. Despite these admissions, Defendants failed to disclose, as required by Item 303, their determination to terminate Vortex and, in light of the Company's prior experience with "distributor turnover," the reasonably certain financial fall-out that would follow from it.

44. On April 30, 2014, the Company filed with the SEC a Quarterly Report on Form 10-Q for the period ended March 31, 2013 (the "March 31, 2014 10-Q").[3] Beginning on page 21, the March 31, 2014 10-Q includes a section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations," which contains the following introductory statement:

> The following discussion and analysis of our financial condition and results of operations should be read together with our consolidated financial statements and related notes included elsewhere in this report. This discussion and analysis contains forward-looking statements that involve risks, uncertainties and assumptions. You should review the cautionary statements under the heading **"Part I; Cautionary Note Concerning Forward-Looking Statements," "Part I; Item 1A. Risk Factors"** in our Annual Report on Form 10-K for the fiscal year ended December 31, 2013, for a discussion of certain of the important factors that could cause actual results to differ materially from the results described in or implied by the forward-looking statements described in the following discussion and analysis. Certain amounts and percentages in this discussion and analysis have been rounded for convenience of presentation. Unless otherwise noted, the figures in the following discussions are unaudited.

March 31, 2014 10-Q at 21 (emphasis in original).

45. The March 31, 2014 10-Q also contains a section entitled "Quantitative and Qualitative Disclosure About Market Risk," under which the following statement appears: "We

---

[3] The March 31, 2014 10-Q was executed by Defendants Paul and Baron.

17

have evaluated the information required under this item that was disclosed in our 2013 Annual Report on Form 10-K and there have been no significant changes to this information." March 31, 2014 10-Q at 27.

46. The foregoing disclosures concerning risks relating to the Company's business, results of operations, and financial condition were false and misleading at the time they were made because, as stated above, Defendants knew or recklessly disregarded that they had determined to terminate the Vortex distributorship and replace Vortex with a new, in-house sales representative to cover the territory. Further, Defendants knew or recklessly disregarded the risk that termination of a "significant" distributor such as Vortex would have a substantial, negative impact upon the Company's business, results of operations, and financial condition. The foregoing omissions render the risk disclosure meaningless. Since an independent distributor with a substantial customer base was about to cease distributing Globus products, the risk that the Company's sales will be adversely affected was no longer hypothetical. Such risk had materialized, and Defendants were duty bound, but failed, to disclose the specific risk to the Company's financial condition.

47. In addition, the foregoing statements violated SEC Regulation S-K, Item 303, 17 C.F.R. § 229.303(b), which required Globus, in its March 31, 2014 10-Q, to "include a discussion of material changes in those items specifically listed in paragraph (a) of this Item." 17 C.F.R. § 229.303(b). By acknowledging that the Company's last instance of "distributor turnover" occurred in 2010, Defendants admitted that the Vortex termination was an "unusual" or "infrequent" event. Further, through their President and COO's acknowledgment that the Company "made the decision not to renew our existing contract with a significant U.S. distributor," and statements from their Chairman/CEO and CFO confirming that it took the Company anywhere from one to two years to recover from "distributor turnover" in 2010, Defendants admitted that the Company reasonably

18

expected that the Vortex termination would have a materially unfavorable impact on its net sales, revenues, and income. Despite these admissions, Defendants failed to disclose, as required by Item 303, their intention to terminate Vortex and, in light of the Company's prior experience with "distributor turnover," the reasonably certain financial fall-out that would follow from it.

### *The Company's False and Misleading Forward-Looking Statements*

48. Globus held an earnings conference call on February 26, 2014, the day before the first day of the Class Period and almost halfway through the first quarter of the 2014 fiscal year, in which Defendants Paul, Baron, and Demski participated. During the call, Defendant Baron provided investors with guidance for the remainder of 2014, which was a reiteration of what the Company had stated in January 2014: "sales in the range of $480 million to $486 million, earnings per fully diluted share of $0.90 to $0.92 per share." Defendant Baron made this statement despite knowing that the assumptions underlying the Company's sales revenue forecast had changed drastically for the worse.

49. Defendants knew that the revenue guidance provided to investors on the February 26, 2014 earnings call was false and misleading because the announced forecast incorporated Vortex's projected sales figures for the remainder of the 2014 fiscal year. As stated above, Defendants knew that they had determined to terminate the Vortex distributorship and replace Vortex with a new, in-house sales representative to cover the territory. Further, Defendants knew the risk that the termination of a "significant" distributor such as Vortex would have a substantial, negative impact upon the Company's business, results of operations, and financial condition. Based on the Company's experience with "distributor turnover" in 2010, Defendants knew that it was going to take the Company anywhere from one to two years before it would recover financially from the loss of Vortex.

50. Despite Defendants' knowledge of the facts set forth above, they failed to disclose them to investors during the February 26, 2014 earnings conference call. As a result of the false and misleading sales revenue projections, investors remained unaware of the bad news awaiting them later in the year.

51. Globus held an earnings conference call on April 29, 2014, more than ten days after the Company had informed Long and Vortex of their intention to terminate the Vortex distributorship, during which Defendants Paul, Baron, and Demski participated. During the call, Defendant Baron provided investors with guidance for the remainder of 2014, which was a reiteration of what the Company had stated both in January 2014 and February 2014: "sales in the range of $480 million to $486 million[, and] [e]arnings per fully diluted share is anticipated to be in the range of $0.90 to $0.92 per share." Defendant Baron made this statement despite knowing that the assumptions underlying the Company's sales revenue forecast had changed drastically for the worse.

52. Defendants knew that the revenue guidance provided to investors on the April 29, 2014 earnings call was false and misleading because the announced forecast incorporated Vortex's projected sales figures for the remainder of the 2014 fiscal year. As stated above, Defendants knew that they had terminated the Vortex distributorship more than 10 days before the April 29, 2014 earnings call, and that they had replaced Vortex with a new, in-house sales representative to cover the territory. Further, Defendants knew the risk that the termination of a "significant" distributor such as Vortex would have a substantial, negative impact upon the Company's business, results of operations, and financial condition. Based on the Company's experience with "distributor turnover" in 2010, Defendants knew that it was going to take the Company anywhere from one to two years before it would recover financially from the loss of Vortex.