IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARK SILVERSTEIN,                          CIVIL ACTION
            Plaintiff,

        v.

GLOBUS MEDICAL, INC., DAVID C.             NO.  15-5386
PAUL, RICHARD A. BARON, DAVID M.
DEMSKI and STEVEN M. PAYNE,
            Defendants.

## OPINION

## I.    INTRODUCTION

In this securities fraud case styled as a class action, Plaintiff alleges that Defendant

Globus Medical, Inc. ("Globus"), a medical device company, and Defendants David C. Paul,

Richard A. Baron, David M. Demski, and Steven M. Payne, Globus executives (collectively,

"Defendants") committed securities fraud by failing to disclose their decision to terminate

Globus's relationship with a major distributor and by issuing revenue forecasts that failed to

account for the loss of that relationship.  Before the Court is Defendants' motion to dismiss.

## II.    BACKGROUND

Globus is a "medical device company focused exclusively on the design, development

and commercialization of musculoskeletal implants."  Am. Compl. ¶¶ 2, 23.  Globus's products

address a broad range of spinal fusion surgical procedures and the treatment of spinal disorders.

*Id*.  As a newcomer in the spinal implant field, Globus relied on a network of independent

distributors who had strong relationships with medical professionals and could market Globus's

products.  *Id*. ¶¶ 25-26.  In 2004, Globus began such a relationship with independent distributor

Vortex Spine, LLC ("Vortex").  *Id*. ¶¶ 4-6.  Vortex and Globus executed an Exclusive

Distributorship Agreement ("EDA"), pursuant to which Vortex agreed to serve as Globus's exclusive distributor covering a territory that encompassed certain portions of Louisiana and Mississippi. *Id*. ¶¶ 5, 26. The 2004 EDA was renewed in 2008 and again in 2010, the latter of which set an expiration date of December 31, 2013. *Id*. ¶ 26.

In or about late 2013, Globus transitioned to a publicly traded company and announced to investors a plan under which it would gradually transition its sales force from a network of independent distributors, including Vortex, to a team of in-house sales representatives. *Id*. ¶ 29. The Amended Complaint alleges that in order to achieve independence from Vortex, Globus engaged in a "scheme" to "str[i]ng Vortex along – promising to negotiate and finalize . . . a new EDA with new sales quotas and commissions rates – while it recruited and secured a new in-house sales representative." ¶¶ 7, 31. Through this negotiation process, Globus "obtained significant confidential and proprietary customer data from Vortex, which it provided to its new territorial sales employee to facilitate the development of a direct relationship between Globus and Vortex's customers." ¶¶ 7, 33. On or about April 18, 2014, Globus advised Vortex that their distributorship relationship was terminated, that no new EDA would be signed, and that it had hired a new in-house sales employee to cover Vortex's territory. *Id*. ¶¶ 34-35.

Plaintiff proposes a Class Period from February 26, 2014 through August 5, 2014. ¶ 1. During this period, Plaintiff alleges that Globus made material misrepresentations and/or omissions with respect to: (1) revenue projections, which Plaintiff argues were based on data that included sales from Vortex that Globus knew it would not receive; and, (2) risk disclosures, which discussed the risk of the loss of distributors in the hypothetical when in actuality Globus knew that it was planning to and did terminate Vortex, a significant distributor.

On February 26, 2014, Globus held an earnings conference call and announced net sales of $434.5 million for its recently completed fiscal year for 2013.  Mot. Ex. 2 at 4.[1]  Earnings per share ("EPS") for 2013 were $0.73.  *Id*. at 6.  In addition, Globus provided financial projections for the 2014 fiscal year.  Globus estimated that sales for fiscal year 2014 would be between $480 million to $486 million, with EPS of $0.90 to $0.92 per share.  Am. Compl. ¶ 48.

On March 14, 2014, Globus filed its 2013 10-K with the SEC.  The 10-K contained a risk disclosure which warned that if Globus were "unable to maintain and expand [its] network of direct sales representatives and independent distributors, [it] may not be able to generate anticipated sales."  *Id*. ¶ 41.  The risk disclosures further state:

> Our operating results are directly dependent upon the sales and marketing efforts of not only our employees, but also our independent distributors.  We expect our direct sales representatives and independent distributors to develop long-lasting relationships with the surgeons they serve.  If our direct sales representatives or independent distributors fail to adequately promote, market and sell our products, our sales could significantly decrease.
>
> We face significant challenges and risks in managing our geographically dispersed distribution network and retaining the individuals who make up that network.  ***If any of our direct sales representatives were to leave us, or if any of our independent distributors were to cease to do business with us, our sales could be adversely affected.***  Some of our independent distributors account for a significant portion of our sales volume, and ***if any such independent distributor were to cease to distribute our products, our sales could be adversely affected.***
>
> . . .

---

[1] "To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record."  *Id.* (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)) (internal quotation marks omitted).  An exception to this rule, however, is that "a 'document *integral to or explicitly relied upon* in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'"  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis added) (alteration in original) (citation and internal quotation marks omitted).  Here, Globus's March 14, 2014 10-K (Mot. Ex. 1), the February 26, 2014 earnings call (Mot. Ex. 2), the April 29, 2014 earnings call (Mot. Ex. 3), and the August 5, 2014 earnings call (Mot. Ex. 4) are all integral to and explicitly relied upon in the Amended Complaint  and thus the Court may consider them without converting the motion into one for summary judgment.  *Burlington*, 114 F.3d at 1426.

> If we are unable to expand our sales and marketing capabilities domestically and internationally, we may not be able to effectively commercialize our products, which would adversely affect our business, results of operations and financial condition.

*Id*. (emphasis added).

On April 29, 2014, Globus held an earnings conference call and provided investors with guidance for the remainder of 2014.  Mot. Ex. 3.  At this time, Globus reiterated the projections previously provided in February 2014, *i.e.*, sales in the range of $480 million to $486 million, and EPS of $0.90 to $0.92 per share.  Am. Compl. ¶ 51.

On April 30, 2014, Globus filed with the SEC a Quarterly Report on Form 10-Q for the period ending March 31, 2013 (the "March 31, 2014 10-Q").  In the report, Globus referred to and reiterated the risk disclosures that appeared in its Annual Report, stating "We have evaluated the information . . . that was disclosed in our 2013 Annual Report on Form 10-K and there have been no significant changes to this information."  *Id*. ¶ 45.

On the last day of the Class Period, August 5, 2014, Globus announced financial results for its recently completed second quarter of 2014.  *Id*. ¶ 54.  At this time, Globus revised downward its financial projections for the full 2014 fiscal year, and told investors it was now anticipating full year sales of between $460 and $465 million, approximately $20 million less than its previous projection.  *Id*. ¶ 55.  Globus's projection for EPS remained unchanged.  *Id*.

That same day, Globus held an earnings call with its investors in which Globus detailed its financial results for the second fiscal quarter of 2014.  *Id*. ¶ 55; Mot. Ex. 4.  During the call, Defendant Demski stated that domestic sales growth in the quarter was below historical standards and explained that the shortfall in revenue was attributable to two factors: (a) the fact that, "early in the quarter [Globus] made the decision not to renew [its] existing contract with a

4

significant U.S. distributor [Vortex], negatively impacting [its] sales, *id*.; and, (b) the fact that Globus had "experienced an uptick in pricing pressure during the quarter." *Id*. at 3.

With respect to pricing pressure, Globus explained that "[h]ospitals continue to aggressively manage implant cost through contract negotiations," the result of which was lower sales prices. *Id*. at 4, 9. With respect to Vortex, Demski explained: "We made the decision not to renew the distributor contact, based upon our belief that our long-term goals will be better met by going in a different direction. We understood the risk to our short-term results, but we feel very confident that our decision was in the best interest of Globus, and that we will be able to recoup these losses and more in the future." *Id*. at. 3. Demski further stated:

> For those of you who have known us for some time, you will recall that we made a comparable decision in 2010 for similar reasons. The decision also negatively impacted our results in the short-term, but was the right long-term decision. Our Company has created significant value since our inception, by following principles that focus on the long-term health of the organization. While these decisions . . . sometimes result in short-term pain, there is no doubt that by consistently following these principles, we have been able to achieve long-term growth and profitability."

*Id*. at 4. Demski was then asked why Globus had not previously disclosed the news about Vortex. He responsed: "Well, I don't think it rises to the level of materiality. We have looked at that from a legal standpoint, and it doesn't rise to that level." Am. Compl. ¶ 55; Mot. Ex. 4 at 9.

On August 6, 2014, Globus's shares fell $4.05 per share or 17.9%, closing at $18.51 per share. Am. Compl. ¶ 56.

Globus's Form 10-K for fiscal year 2014 showed earnings of $474.4 million in sales and an EPS of $0.97. Mot. Ex. 6 at 73.[2]

---

[2]    The Court may take judicial notice of SEC filings on a motion to dismiss. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 163 n.3 (3d Cir. 2014) (taking judicial notice on appeal of SEC filings).

### III.    LEGAL STANDARD

Plaintiff asserts violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.  "[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true."  *Inst. Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) ("*Avaya*") (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309 (2007)).  Because this is a securities fraud case, however, the complaint must satisfy the heightened pleading rules codified in the Private Securities Litigation Reform Act ("PSLRA").  *Id.*  Congress adopted these stringent pleading standards as "a check against abusive litigation," recognizing that "[p]rivate securities fraud actions . . . can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law."  *Tellabs*, 551 U.S. at 313.

The PSLRA "imposes two exacting and distinct pleading requirements."  *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010).  First, with respect to false and misleading statements, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation . . . is made on information and belief, . . . state with particularity all facts on which that belief is formed."  *Id.* (citing 15 U.S.C. § 78u-4(b)(1)).  In other words, the complaint must "state the allegations with factual particularity," including pleading the "who, what, when, where and how."  *Avaya*, 564 F.3d at 253.  Second, the PSLRA also enhances the requirements of Federal Rule of Civil Procedure 9(b) and requires the complaint to "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind."  *Aetna*, 617 F.3d at 277 (citing 15 U.S.C. § 78u-4(b)(2)).

Both provisions require facts to be pleaded "with particularity." *Avaya*, 564 F.3d at 253. The Third Circuit has explained that "[t]his particularity language echoes precisely Fed. R. Civ. P. 9(b)." *Id*. (citations omitted); *see* Fed. R. Civ. P. 9(b) ("[A] party must state with particularity the circumstances constituting fraud or mistake."). The PLSRA's requirement for pleading scienter, however, extends beyond Rule 9(b). Under the PSLRA, a plaintiff can no longer plead the requisite scienter element generally. Instead, under the PSLRA's "[e]xacting" pleading standard for scienter, "any private securities complaint alleging that the defendant made a false or misleading statement must . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Avaya*, 564 F.3d at 253 (citing *Tellabs*, 551 U.S. at 320). A strong inference of scienter "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 309. The Court must consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Avaya*, 564 F.3d at 267-68 (quoting *Tellabs*, 551 U.S. at 321).

Plaintiff must satisfy the above pleading requirements whether the alleged fraudulent statement at issue is an assertion of current fact or a prediction of the future. The PSLRA "imposes additional burdens, however, with respect to allegations involving predictions." *Id*. at 254. The Safe Harbor provision, 15 U.S.C. § 78u-5(c), immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood. *Id*.

**IV.     DISCUSSION**

Section 10(b) makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *U.S. v. Schiff*, 602 F.3d 152, 161 (3d Cir. 2010). To state a claim under Section 10(b) and Rule 10b-5, Plaintiff must adequately allege: "(1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and, (6) loss causation." *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 268 (3d Cir. 2005) (citations omitted). Under Section 10(b) and Rule 10b-5, a plaintiff must plead that each challenged statement contains an "untrue statement of a material fact or . . . omit[s] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Avaya*, 564 F.3d at 259 (citation omitted).

Plaintiff challenges as false and misleading two types of statements: (1) Globus's earnings projections as articulated on February 26, 2014 and reiterated on April 29, 2014, which are forward-looking statements, and, (2) Globus's risk disclosures in its Annual Report, filed on March 13, 2014 and its April 30, 2014 10-Q, which Plaintiff argues contain material omissions of historical fact. Defendants argue that Plaintiff's allegations with respect to both types of statements fail because he has failed to plead a material misrepresentation or scienter. Mot. at 9. In addition, they argue that Plaintiff has failed to plead sufficient facts showing that the forward-looking statements are not entitled to the PSLRA's statutory Safe Harbor. *Id.*; 15 U.S.C. §¶ 78u-5(c); *Aetna*, 617 F.3d at 278; *Avaya*, 564 F.3d at 253-54.

A.    *Forward Looking Statements*

"The federal securities laws do not obligate companies to disclose their internal forecasts." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1427.  However, if a company voluntarily chooses to disclose a forecast or projection, the company must have a reasonable basis for making that disclosure. *Id*. (citations omitted).  To survive a motion to dismiss, therefore, Plaintiff bears the burden of "plead[ing] factual allegations, not hypotheticals, sufficient to reasonably allow the inference" that the forecasts were made with either: (1) inadequate consideration of the available data; or, (2) the use of unsound forecasting methodology." *Id*. (citations omitted).

Here, Plaintiff alleges that Globus's projections on February 26, 2014 for fiscal year 2014 sales ranging from $480-486 million were false and misleading because they "incorporated Vortex's sales figures for the remainder of the 2014 fiscal year" despite the fact that Globus knew it would terminate Vortex, that "the termination of Vortex would have a substantial, negative impact . . . upon the Company's sales for at least the next year or more, and that, as a result, "the assumptions had changed drastically for the worse." Am. Compl. ¶¶ 22, 48, 51. Plaintiff argues that in light of Globus's plan to terminate its contract with Vortex, it knew that the projections it made for fiscal year 2014 were "untenable," "unattainable," "impossible," and "false." Opp'n at 2, 8.  Defendants argue that Plaintiff's allegations are conclusory and fail to meet the exacting requirements set forth in the PSLRA.  Defendants further argue that the projections are entitled to Safe Harbor protection because the accompanying cautionary language was sufficiently specific, the projections were not material, and they were not made with actual knowledge of falsity.

9

### 1.    False or Misleading

Defendants argue that Plaintiff failed to plead facts from which the Court can reasonably infer that the projections were misleading at the time they were made.  *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) ("To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events.").  In particular, Defendants argue that Plaintiff fails to satisfy the heightened pleading standards under the PSLRA because he has not pled any facts detailing Vortex's actual historical sales at the time Globus made the challenged projections or the amount of sales that Vortex contributed from the Louisiana and Mississippi territory compared to Globus's total sales.  Mot. at 10.  In addition, Defendants argue that Plaintiff has failed to plead what Globus projected with respect to Vortex's sales, what Vortex's sales actually were for the year, the amount of the shortfall from Vortex, how the shortfalls from Vortex impacted Globus, and the dates.  *Id*. at 11 (citing *Bldg. Trades United Pension Trust Fund v. Kenexa Corp.*, No. 09-2642, 2010 WL 3749459, at *2, *7, *8 (E.D. Pa. Sept. 27, 2010)).  Without such facts, Defendants argue, there is no basis for the Court to conclude that the loss of Vortex would have had a "substantial, negative impact" on Globus's sales.  *Id*. at 10.  In reality, Defendants argue, there was nothing "false, unattainable, or impossible about those projections."  Hr'g Tr. at 12.  Rather, Defendants assert, the revised projections were merely a "midcourse correction, a conservative correction" that ultimately "turned out to be way too conservative" given that the end of year results essentially met the original projections.  *Id*.  Indeed, Globus's net revenue for fiscal year 2014 was a "record" $474.4 million, which was just 1.17% below the lower range projected in February and April.  Mot. at 13.

In response, Plaintiff asserts that he has adequately pled falsity because "[i]ssuing sales guidance based on projected sales from a distributor which the Company knows it will terminate

is false and misleading because it is based on false or highly likely assumptions." Opp'n at 8. Plaintiff points specifically to his allegations that the projections "incorporated projected revenues from Vortex for the remainder of the fiscal year, even though Defendants 'knew that they had determined to terminate the Vortex distributorship and replace Vortex with a new, in-house sales representative to cover the territory' and knew that it 'was going to take the Company anywhere from one to two years before it would recover financially from the loss of Vortex.'" *Id*. at 9 (citing Am. Compl. ¶¶ 49-50). But, as Defendants note, these allegations are nothing more than conclusory assertions. The Amended Complaint contains no factual allegations from which the Court could plausibly infer that the projections: a) incorporated revenue from Vortex; or b) how significant Vortex's revenue would have been compared to Globus's total sales. At oral argument, counsel for Plaintiff additionally pointed to statements made during the August 5, 2014 call that he asserts support falsity. In particular, counsel pointed to a question from an analyst asking if Globus "would have changed guidance if not for the distributor issue, and it was just the pricing," to which Defendant Baron replied, "To be honest, I don't think we should comment on that." Hr'g Tr. at 55. Plaintiff interprets Defendant Baron's silence as an admission that the projections accounted for revenue from Vortex. Such silence does not satisfy the particularity requirement imposed by the PSLRA.

Globus made projections that it later adjusted downward but ultimately accomplished anyway. Plaintiff believes that the projections were actionably false because they included revenue from Vortex that should not have been included in light of Defendants' decision to terminate the relationship, but he has pointed to nothing but his own speculation that the projections in fact included such revenue. More significantly, because Globus actually or nearly achieved the original projected results, it follows that the projections were neither "impossible"

11

nor "unachievable." Accordingly, Plaintiff has failed to plead that the projections were false or misleading when made. *See Avaya*, 564 F.3d at 266 ("Defendants contend that, at the time of the forecast-related statements . . . the projections were possible to achieve. The facts alleged in the Complaint, when viewed against the backdrop of the successful Q1 results, do not belie this conclusion. We therefore agree with defendants that Shareholders have failed to plead with the requisite particularity the allegation that the October and January forecasts were false or misleading when made.").

### 2.    Applicability of Safe Harbor

Although Plaintiff's failure to plead that the projections were false or misleading is itself sufficient to dispose of his claims with respect to those projections, it is also the case that Plaintiff's claims must be dismissed because the projections fall within the PSLRA's Safe Harbor. As discussed above, the Safe Harbor provisions of the PSLRA shield from liability any forward-looking statement that is: (1) accompanied by meaningful cautionary statements; (2) is immaterial; or (3) was not made with actual knowledge of falsity. 15 U.S.C. § 78u-5(c)(1).

### a.    *Cautionary Language*

"Cautionary language must be 'extensive and specific.'" *Avaya*, 564 F.3d at 256 (citing *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243 n.3 (3d Cir. 2004)). Vague or boilerplate disclaimers which "merely warn[] the reader that the investment has risks will ordinarily be inadequate to prevent misinformation." *Id*. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions" which the plaintiff challenges. *Id*. (citation omitted).

Here, Defendants argue that Globus provided warnings with respect to the revenue projections that satisfy the above criteria both when it provided its guidance on February 26,

2014 and when it reiterated the guidance on April 29, 2014.  Mot. at 15.  Specifically, the risk

disclosures warned that:

> During this call, certain items may be discussed that are not based entirely on historical facts.  These items should be considered forward-looking statements and are subject to many risks, uncertainties and other factors that are difficult to predict and may affect our businesses and operations.  As a result, our actual results may differ materially and adversely from those expressed or implied by our forward-looking statements.
> . . .
>
> We undertake no obligation and do not intend to update any forward-looking statements as a result of new information or future events or circumstances arising after the date on which it was made.  The financial information discussed in connection with this call reflects estimates based on information available at this time and could differ materially from the amounts ultimately reported on our 2013 Form 10-K.

Mot. Ex. 2.  In addition Globus provided detailed risks concerning its reliance on independent

distributors.  It warned that if it is "unable to maintain and expand our network of . . .

independent distributors, [Globus] may not be able to generate anticipated sales."  Am Compl. ¶

41.  Globus further stated:

> Our operating results are directly dependent upon the sales and marketing efforts of not only our employees, but also our independent distributors.  We expect our direct sales representatives and independent distributors to develop long-lasting relationships with the surgeons they serve.  If our direct sales representatives or independent distributors fail to adequately promote, market and sell our products, our sales could significantly decrease.
>
> . . .
>
> Some of our independent distributors account for a significant portion of our sales volume, and if any such independent distributor were to case to distribute our products, our sales could be adversely affected. . . . which may or may not prevent our sales from being adversely affected.  If [an] independent distributor were to depart and be retained by one of our competitors, we may be unable to prevent them from helping competitors solicit business from our existing customers, which could further affect our sales. . . . Failure to hire or retain qualified direct sales representatives or independent distributors would prevent us from maintaining or expanding our business and generating sales.

Mot. Ex. 1.

Defendants argue that these cautionary statements include a detailed list of factors that could affect Globus's business.  Mot. at 16.  Plaintiff, on the other hand, argues that the above disclosures were not meaningful because they failed to account for the loss of Vortex.  Opp'n at 15-17.  Plaintiff argues that by February 24, 2014, Defendants already knew that they had decided to terminate Vortex, and by April 28, 2014, the relationship with Vortex had already been severed.  *Id*.  Thus, Plaintiff concludes, the risks Globus warned were meaningless because they had "already come to pass."  *Id*. at 17.

Plaintiff fundamentally mistakes the difference between a risk disclosure, which informs the public as to areas in which a company's business could be affected by outside forces, and a business decision, which is a deliberate act a company takes in light of its own best interests.  Here, Globus warned investors that it *risked* the loss of distributors who choose to take their business elsewhere.  It did not warn about its "determination to terminate Vortex" because that was not risk; it was a business decision.  Thus, the fact that Globus knew but did not disclose the fact that it had decided to terminate the relationship with Vortex, or that had already terminated its relationship with Vortex, does not render those disclosures misleading.  Globus warned that distributors might "cease" to do business with Globus, "fail" to promote Globus's products, "depart," or "be retained by other companies."  Globus's decision to replace Vortex with its own staff corresponds with none of those scenarios.  Accordingly, the Court finds that Globus's risk disclosures were meaningful and would warrant the application of the Safe Harbor.

### b.  *Scienter*

Having concluded that Plaintiff has failed to plead a misstatement with respect to Globus's projects and that Defendants are entitled to protection under the Safe Harbor for forward-looking statements, the Court need not separately address whether Defendants are also entitled to either of the other Safe Harbor provisions, *i.e.*, immateriality and scienter.  However,

14

the Court will briefly note that Plaintiff has clearly failed to plead facts that would establish actual knowledge of falsity.  Plaintiff argues that he has pleaded actual knowledge by pointing to his allegations that Globus knew it would terminate its relationship with Vortex at the time it made its projections in February 2014 and that it knew it had already terminated its relationship with Vortex at the time it reiterated those projections in April 2014.  *See* Opp'n at 19-20.  Again, Plaintiff conflates two distinct concepts.  The relevant inquiry here is not whether Globus knew that it would lose Vortex's sales but whether Globus knew in February and April 2014 that as a result of losing Vortex its projections were false.

Plaintiff has pointed to no such evidence.  For example, Plaintiff points to Demski's statement during the August 5, 2014 earnings call concerning Globus's decision in 2010 to terminate a contract with another distributor, which Demski described as causing "short-term pain."  Hr'g Tr. at 52.  Plaintiff argues that the Court can infer from this statement that Globus knew based on its experience in 2010 that terminating the contract with Vortex would cause similar short-term pain.  *Id*.  But simply knowing that the loss of a distributor may cause a drop in sales does not mean that Globus failed to account for this drop in its projections.  As Plaintiff himself alleges, Globus was engaged in a strategy to "gradually transition its sales force from a network of independent distributors, such as Vortex, to a cadre of in-house sales representatives."  Am. Compl. ¶ 29.  Indeed, Globus's risk disclosures are replete with references to the fact that its sales depend upon the efforts of both "direct sales representatives" and "independent distributors."  *See, e.g.*, Mot. Ex 1 at 28.  Given the paucity of factual allegations supporting Plaintiff's theory that Defendants incorporated Vortex's sales into their projections, the much more plausible inference from the facts alleged is that the Defendants' projections accounted for their change in strategy, and that Defendants revised their projections in August

15

2014 after the second quarter results indicated that the strategy might not be as successful as anticipated.  Accordingly, the Court rejects Plaintiffs assertions that he has provided a strong inference of actual knowledge that the projections were false or misleading.  *See Tellabs*, 551 U.S. at 314 ("[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.").

**B.    *Historical Statements***

Plaintiff's allegations with respect to historical statements fare no better.  The Amended Complaint alleges that Globus's risk disclosures in its March 13, 2014 10-K and April 30, 2014 10-Q were materially misleading because they omitted the fact that Defendants had already intended to terminate Vortex prior to March 14, 2014 and in fact terminated Vortex no later than April 18, 2014.  Opp'n at 11.  Defendants argue that Plaintiff's claim fails to plead facts from which the Court could infer that the risk disclosures were false, that the omissions were material, or that Defendants had a duty to disclose any information about Vortex.  Mot. at 22-23.  Finally, Defendants argue that Plaintiff has failed to adequately plead scienter.  *Id*. at 24.

**1.    Falsity**

Defendants argue as an initial matter that Plaintiff has failed to plead that Globus's risk disclosures were false.  Mot. at 22.  With respect to the March 13, 2014 disclosures, Defendants argue that Plaintiff has pled only that "at some unspecified time, there was a 'determination to terminate the Vortex distributorship," but that there are no allegations from which to infer that Globus had made such a determination as early as March 2014.  *Id*.  With respect to the April 30, 2014 risk disclosures, Defendants argue that the Amended Complaint pleads only that Globus *constructively* terminated Vortex on April 18, 2014, and that there are no allegations as to when Vortex was *in fact* terminated.  *Id*.  Thus, Defendants conclude, there is no basis to infer that the risk disclosures were false or misleading in failing to reveal the loss of the Vortex relationship.

16

A review of the Amended Complaint indicates that Plaintiff has alleged a factual basis to support an inference that Globus knew it was planning to terminate the Vortex relationship prior to the March 13, 2014 10-K and knew that it had already terminated Vortex by the time it filed its April 30, 2014 10-Q.  With respect to the former, the Amended Complaint alleges that Globus's contract with Vortex was set to expire in December 2013, Am. Compl. ¶ 26, and that by "late 2013" Globus had announced its plan to transition to in-house sales representatives.  *Id*. ¶ 29.  The Court infers from these facts that by March 13, 2014, Globus knew it was likely to end its relationship with Vortex.  With respect to the April 30, 2014 disclosures, the Amended Complaint alleges that Globus arranged to meet with Vortex on April 18, 2014 to propose a new contract that it knew Vortex would not accept, thus constructively terminating Vortex as a distributor.  *Id*. ¶¶ 34-36.  These allegations are sufficiently specific to infer for purposes of this motion to dismiss that Globus knew prior to filing its April 30, 2014 10-Q that it would no longer be working with Vortex.

## 2.    Material Omission

With respect to materiality, Defendants argue that the Amended Complaint fails to plead with particularity that, assuming Globus improperly included revenue from Vortex in its revenue calculations, any shortfall that can be attributed to the loss of the Vortex relationship was material.  Mot. at 12.  According to Defendants, "two indisputable facts highlight Plaintiff's inability to plead that the non-renewal of the contract with Vortex was material." *Id*. at 13.  First, Globus earned "record sales of $474.4 million for 2014" despite the loss of Vortex, which meant that their total revenue for fiscal year 2014 was only 1.17% below the pricing guidance provided on February 26, 2014.  *Id*.  Defendants argue that under Third Circuit precedent, similar discrepancies were held to be quantitatively immaterial even in instances in which the stock price dropped after disclosure of the information.  *Id*. (citing *In re Westinghouse Sec. Litig.*, 90 F.3d

696, 715 (3d Cir. 1996); *Burlington*, 114 F.3d at 1427 ("Where the data alleged to have been omitted would have had no more than a negligible impact on a reasonable investor's prediction of the firm's future earnings, the data can be ruled immaterial as a matter of law.").  Second, Plaintiff fails to address the fact that during the August 5, 2014 call, Globus identified two issues as causing the reduced price guidance, *i.e.*, the loss of Vortex *and* increased pricing pressure. Mot. at 14.  Defendants argue that, without additional facts, there is no way to know the impact of each contributing factor and thus whether the loss of Vortex had a material impact.  *Id*.

Plaintiff responds that under clear Third Circuit precedent, information is material if its disclosure results in an immediate stock price change.  Indeed, while "[o]rdinarily, the law defines 'material' information as information that would be important to a reasonable investor in making his or her investment decision," the  Third Circuit has clearly adopted the "efficient market" theory in which courts measure the materiality of undisclosed information by looking to stock price movement in the period immediately following the disclosure.  *Burlington*, 114 F.3d at 1425 ("In the context of an 'efficient' market, the concept of materiality translates into information that alters the price of the firm's stock.  This is so because efficient markets are those in which information important to reasonable investors (in effect, the market) is immediately incorporated into stock prices. ") (internal citations omitted); *see also Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("[W]hen a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock.").

Here, because the information about Vortex was disclosed on August 5, 2014, the Court looks to the movement in the price of Globus's stock following disclosure to determine if the information was material.  Plaintiff alleges that on August 6, 2014, Globus's stock price fell

18

$4.05 per share or 17.9%. Am. Compl. ¶ 56. Defendants argue that this change in stock price could have occurred as a result of Globus's reduced revenue projections, which it concedes would be material, and not because of Globus's specific relationship with Vortex, one distributor out of many. Hr'g Tr. at 63-64. While Defendants raise an interesting point, those arguments are appropriate for a motion for summary judgment. On a motion to dismiss, however, the Court interprets the facts in the light most favorable to Plaintiff and concludes that he has shown materiality under *Burlington-Oran*.

However, even accepting for purposes of this motion that the information about Vortex was material, "[t]his does not end our inquiry" as "[e]ven non-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose the information." *Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000). "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Id.* (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)); *Burlington*, 114 F.3d at 1432 ("Except for specific periodic reporting requirements[,] . . . there is no general duty on the part of a company to provide the public with all material information."). A duty to disclose arises only in three circumstances: where there is insider trading; a statute requiring disclosure; or, an inaccurate, incomplete or misleading prior disclosure. *Oran*, 226 F.3d at 285-86; *see also Schiff*, 602 F.3d at 163 (holding that "the list describing the derivation of a duty to disclose in *Oran* is exclusive") (citing *Winter Family Trust v. Queen*, 503 F.3d 319, 329 (3d Cir. 2007)).

Here there is no allegation of insider trading, and Plaintiff appears to concede that there is no statutory requirement that would give rise to a duty under Section 10(b).[3] Nor does the

---

[3]    In the Amended Complaint, Plaintiff alleged that Defendants had a duty under the disclosure requirements in Item 303(a) of Regulation S-K, 17 C.F.R. § 229.303(a)(3)(i), (ii) and Item 303(b), 17 C.F.R. § 229.303(b)(1), (2). Am. Compl. ¶¶ 43, 47. In their motion to dismiss, Defendants argue, and Plaintiff concedes, that Item 303 does not "create an independent cause of action for private plaintiffs" and that "[n]either the language of the regulation nor

Amended Complaint contain allegations concerning a prior "incomplete or misleading disclosure," such as a statement in a prior SEC filing in which Globus stated that it planned to maintain its relationship with all of its independent distributors generally or Vortex specifically. Indeed, Plaintiff has not identified a single instance prior to August 5, 2014 in which Globus said anything about Vortex.  And, as discussed throughout this Opinion, the Amended Complaint alleges that Globus in fact "announced to investors a plan under which it would gradually transition its sales from a network of independent distributors, such as Vortex, to a cadre of in-house sales representatives, the latter of whom, in the Company's view, would be easier to exercise authority over and whose costs would be controlled."  Am. Compl. ¶ 29.  Globus' decision to terminate Vortex corresponds entirely with this statement.  Thus, none of the three established avenues to finding a duty to disclose apply.

Despite the Third Circuit's clear ruling that the list of duties identified in *Oran* is exhaustive, Plaintiff posits that Globus had a duty to disclose that it terminated its relationship with Vortex under a separate theory.  Specifically, Plaintiff argues that a duty arose because the risk disclosures were misleading as a result of the alleged omissions.  *See* Opp'n at 11.[4]  In support of his position, Plaintiff directs the Court to *Flynn v. Sientra, Inc.*, No. 15-7548, 2016 WL 3360676 (C.D. Cal. June 9, 2016), a recently decided case in which the Central District of California held that a defendant's omission was actionable where the defendant warned about a specific risk knowing that the precise issue had already occurred.  In that case, the plaintiff alleged that the defendants' SEC filings contained a risk disclosure that warned of the possibility

---

the SEC's interpretive releases construing it suggest that it was intended to establish a private cause of action."  Mot. at 22-23 (citing *Oran*, 226 F.3d at 287)).  Thus, a "violation of SK-303's reporting requirements does not automatically give rise to a material omission under Rule 10b-5" and a duty of disclosure under Section 10(b) and Section 10b-5 "must be separately shown."  *Oran*, 226 F.3d at 288-89.

[4]   Plaintiff argues that "Defendants fail to argue that there was no Section 10(b) duty to disclose" and that "[a]s such, Defendants concede that there was a duty to disclose the facts regarding the Vortex termination under Section 10(b), and arguments raised on reply should be disregarded."  Opp'n at 11-12 n.6.

that its manufacturing partner might fail to follow proper manufacturing practices or have significant compliance issues. *Id*. at *11. The *Flynn* complaint also alleged that prior to these disclosures, the defendant had conducted an internal investigation that confirmed regulatory complaints of contamination in its products. The court found the defendants' risk disclosures to be "more than plausibly misleading when viewed in conjunction with Plaintiffs' allegations that serious regulatory issues had already transpired by the time these statements were made." *Id*. Thus, in essence, *Flynn* held that when a company identifies risks it has a duty to speak truthfully concerning whether such risks have already come to pass.

Even assuming such a duty exists, the factual allegations upon which *Flynn* was based are not present here. In *Flynn*, the precise situation that the defendants disclosed as a risk in their disclosures was alleged to have actually taken place. Here, as discussed in the section on cautionary language, the risk that Globus identified in its disclosures was not the same as the event that Plaintiff alleges had come to pass. Specifically, the risk disclosures in Globus's 10-K and 10-Q warned that its sales "could be adversely affected" in two scenarios: (1) "[i]f any of [Globus's] direct sales representatives were to leave [Globus]; or, (2) "if any of [Globus's] independent distributors were to cease to do business with [Globus]." Mot. Ex. 1 at 28. In other words, Globus's disclosures warned against the risk that one of Globus's direct sales representatives or distributors would elect not to work with Globus in the future. What occurred, however, was something different: Plaintiff alleges that Globus independently "determined to terminate" Vortex on its own initiative. *See* Hr'g Tr. at 15. This was a business decision, not a risk that had come to fruition. Accordingly, the Court concludes that Plaintiff has failed to plead an actionable omission.

**C.**     *Section 20(a)*

Section 20(a) creates a cause of action against individuals who exercise control over a

"controlled person," including a corporation, that has committed a violation of Section 10(b).  15

U.S.C. § 78t(a).  Liability under Section 20(a) is derivative of an underlying violation of Section

10(b) by the controlled person.  *Avaya*, 564 F.3d at 252.  Because Plaintiff has failed to plead a

violation of Section 10(b), his claims under Section 20(a) necessarily also fail.  An appropriate

order follows.


                                        **BY THE COURT:**

                                        **/S/WENDY BEETLESTONE, J.**

                                        _____

                                        **WENDY BEETLESTONE, J.**